**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2169-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JACLYN M. APPLEGATE,

    Defendant-Appellant.

_____

Submitted May 18, 2026 – Decided May 28, 2026

Before Judges Sabatino and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 23-08-1395.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Colin Sheehan, Assistant Deputy Public Defender, of counsel and on the briefs).

Bradley D. Billhimer, Ocean County Prosecutor, attorney for respondent (Samuel Marzarella, Chief Appellate Attorney, of counsel and on the brief; Cheryl L. Hammel, Assistant Prosecutor, on the brief).

PER CURIAM

After a jury convicted defendant Jaclyn M. Applegate for obstructing the administration of law or other governmental functions, N.J.S.A. 2C:29-1(a), and unlawful possession of a weapon, N.J.S.A. 2C:39-5(d), both fourth-degree crimes, she was sentenced to concurrent terms of twelve-months of probation plus related fines and costs. Before us, she challenges only her convictions and argues:

> POINT I
>
> [HER] CONVICTIONS MUST BE REVERSED BECAUSE THE STATE FAILED TO PROVE BEYOND A REASONABLE DOUBT EVERY ESSENTIAL ELEMENT OF OBSTRUCTION AND THE UNLAWFUL POSSESSION OF A WEAPON.
>
> a.   The State failed to prove beyond a reasonable doubt that [she] acted with the purpose of obstruction.
>
> b.   The State failed to prove beyond a reasonable doubt that [she] possessed the pocketknife under circumstances not manifestly appropriate for lawful use.

For the reasons that follow, we disagree with all of defendant's arguments and accordingly affirm her convictions.

I.

After her arrest following an incident on January 19, 2021, defendant was charged with third-degree resisting arrest, N.J.S.A. 2C:29-2(a)(3)(a); fourth-

degree obstructing; fourth-degree possessing certain weapons, N.J.S.A. 2C:39-3(e), namely an "out[-]of[-]the[-]front automatic switch blade"; fourth-degree unlawfully possessing that "out[-]of[-]the[-]front automatic switch blade"; and fourth-degree unlawfully possessing a separate "four[-]inch pocket[-]knife."

During trial, Officer Gregory Mezzanotte, a police officer with five years of experience in the Ocean Township Police Department in Waretown and the first responding officer, testified to the facts that led to defendant's arrest. Officer Mezzanotte stated that on the night of January 19th, before his shift, he attended a briefing where he learned the Department received information from a neighboring police department "to be on the lookout for a vehicle and a subject" because the individual lived in the town and was allegedly "involved in . . . buying and selling . . . drugs, acting as a police officer, and robbing other drug dealers in the area . . . ." He testified he and the other officers at the briefing were informed of the individual's identity, that he drove or was associated with a "2009 [black] Dodge Charger," his potential possession of a firearm, and an outstanding warrant in a separate municipality for a "motor vehicle offense."

Within "two minutes of leaving [the] briefing," at 8:15 p.m., Officer Mezzanotte testified that he observed a black Dodge Charger with a female driver, as well as a "male front passenger and . . . another . . . male sitting in the

back seat," who Officer Mezzanotte recognized as the individual from the photograph he received at the briefing. Officer Mezzanotte stated he observed the driver commit several traffic violations including operating the car erratically and not using a turn signal. At this point, Officer Mezzanotte testified that he "alerted other officers [over the radio] . . . and . . . attempted to turn around to make contact" with the vehicle and the individual discussed at the briefing.

Officer Mezzanotte next observed the Dodge Charger already parked on the side of the road with the individual, later revealed to be defendant's boyfriend, "outside of the vehicle . . . [and] waving [him] down." In addition to waving, Officer Mezzanotte testified he observed defendant's boyfriend "reaching . . . inside of the back of the car," in what he believed was the boyfriend's attempt to "ambush" him with the firearm referenced during the briefing. Concerned with his safety, Officer Mezzanotte testified he activated his vehicle's emergency lights, alerted other officers, and parked further behind the vehicle, approximately fifty feet, than he would have normally.

Officer Mezzanotte stated the mobile video recorder (MVR), which is "essentially a dash cam with a microphone" that clips onto his uniform was activated but did not have audio due to his decision to not attach the microphone

4

to his uniform as he approached because he believed that he "was being ambushed" and needed to exit his vehicle as "immediately as [he] could to protect [him]self."[1]  As he approached the vehicle from the passenger's side, Officer Mezzanotte stated he instructed defendant's boyfriend to place his hands on the trunk of the vehicle.  He testified the boyfriend complied but also informed the officer that the male front passenger, later identified as a friend of the boyfriend, was overdosing.

As Officer Mezzanotte attempted to secure and isolate the boyfriend, he observed the female driver, later identified as defendant, moving her hands "through the passenger compartment, the center console, and the back seat of the vehicle."  Officer Mezzanotte testified that in light of defendant's movements and the arrival of Officer Joel Sawyer, who removed defendant's boyfriend from the immediate vicinity of the vehicle, he shifted his focus onto defendant and accordingly instructed her "approximately ten times" to "show [him] her hands and put her hands on the steering wheel."

---

[1]  Officer Mezzanotte also testified, and his MVR footage confirmed, that he was able to clip the microphone onto his uniform after the scene was "secure," once defendant was in handcuffs and the officers tended to the friend in the front seat.

A-2169-23

During their interaction, defendant responded to the officers' repeated instructions with "vulgar language," in which she emphasized her displeasure and her intent to ignore his instructions. Officer Mezzanotte observed, using his flashlight, a "folding knife with a black handle in the [vehicle's] center console," which he could see because the console did not have a lid. In light of the "folding knife," referred to as a pocketknife in the indictment, Officer Mezzanotte drew his firearm and continued to instruct defendant to place her hands on the steering wheel.

Officer Nicholas McGavin also arrived at the scene. He, like Officer Sawyer and Mezzanotte, was also at the briefing minutes earlier. Officer Mezzanotte testified he quickly "advised [Officer McGavin] that the occupants of the vehicle were moving around, [he] saw a knife in the car, and that [defendant] needed to be removed from the vehicle." At this point, Officer Mezzanotte stated Officer McGavin approached the driver's side of the vehicle, instructed defendant to exit the vehicle, and attempted to remove her from the car after she continued to fail to comply with his orders.

After holstering his weapon, Officer Mezzanotte testified he observed Officer McGavin "struggling to remove [defendant] from the vehicle," and maneuvered around the rear of the car to the driver's side to assist him. While

he ran behind the vehicle, Officer Mezzanotte stated he observed Officer McGavin deploy "O.C. spray," which is the "police version of . . . mace or pepper spray," in what he believed, was an attempt to stop defendant from her repeated attempts to reach into the center console where the pocketknife was located.

Officer Mezzanotte stated defendant "lock[ed] her arms up through the steering wheel . . . and then pushe[d] herself back into the seat of the car." After Officer Mezzanotte used a "head control technique" to free defendant's arms from the steering wheel, Officer Mezzanotte observed Officer McGavin grab her left arm, but defendant used her right arm to continue "grabbing throughout the center console." The officers finally removed her from the vehicle after "continu[ing] to pull on her body until she finally let go and loosen[ed] her body." Officer Mezzanotte stated defendant initially "covered and tensed up" such that the officers could not control her hands and arms immediately.

After struggling with defendant on the ground on the side of the road but finally securing her in handcuffs, the officers attended to the friend, who remained in the passenger's seat of the car and insisted he was overdosing on a drug he had earlier ingested but could not confirm what, and how much, he consumed. Officer Mezzanotte "immediately contact[ed] dispatch to send an

7

ambulance to [their] location," but stated he did not believe the individual was overdosing based on his experience and observations that his eyes reacted to light, he was not lethargic, and he was completely aware of his surroundings. After receiving emergency aid, defendant, her boyfriend, and the vehicle were searched, and the officers seized the "black[-]handled folding pocketknife from the center console of the vehicle," which Officer Mezzanotte observed during his initial interaction with defendant.

After introducing a photo of the pocketknife from the night of the incident, the State introduced the knife at trial, which Officer Mezzanotte handled and described as having "flipper on it . . . to [o]pen it up in a fast manner and . . . a pocket clip." He also stated it was an "approximately four-to-four-and-a-half-inch knife" and confirmed it was, indeed, the pocketknife he believed defendant was attempting to reach during their initial exchange. As noted, the State also introduced MVR recordings from Officer Mezzanotte and Officer McGavin of the incident which confirmed that the entire interaction from Officer Mezzanotte's arrival to defendant's eventual handcuffing occurred over the course of only a few minutes.

The State also called Officer McGavin, who corroborated Officer Mezzanotte's testimony, including the information disseminated at the officers'

briefing, Officer Mezzanotte's call for backup, and his repeated instructions to defendant. As he approached the vehicle from the driver's side, Officer McGavin testified he, like Officer Mezzanotte, observed defendant reaching toward the center console. After opening the driver's door to remove defendant, Officer McGavin asked her to exit the vehicle, at which point he grabbed her left arm to forcibly remove her while she repeatedly reached "toward the center console area," where he observed a "folding-type knife," identified as the pocketknife. He testified that, although defendant later told the officers that she was merely attempting to reach for her phone, he stated she was, indeed, "reaching in the area [of the knife] and was uncooperative."

Next, the State called Officer Sawyer, who corroborated the previous officers' testimony, including the officers' instructions to defendant and her corresponding refusal to comply. He testified, however, that because he was attempting to "secure" defendant's boyfriend in one of the patrol vehicles away from the immediate vicinity of defendant's vehicle, he "was unable to make out exactly what was being said."

After the State presented its witnesses, defendant moved for a directed verdict with respect to the charges for resisting arrest, possessing certain prohibited weapons, and unlawfully possessing a separate "out-of-the-front"

automatic switchblade that the officers did not identify until after their search of the vehicle. After considering the parties' arguments and the testimony, the court denied the motion for a directed verdict, in light of the "credible testimony" from the officers, as well as the MVR footage and the seizure of the weapons.

Next, defendant presented her case and began with testimony from her boyfriend. Relevant to the appeal before us, defendant's boyfriend testified the pocketknife at the top of the center console that the officers observed, which he further described as including a "benchmark-assisted blade" was, indeed, his knife, which he regularly used to repair his car, along with the other contents of the center console including a screwdriver, wires, scissors, and flashlights. Specifically, he testified he used the knives, both the folding pocketknife and the switchblade, to "strip wire . . . and to turn screw[s]." He explained that because he is not a mechanic, he repaired the car weekly and testified he used the knives for their convenience and the fact that he "can use what he wants," especially when he was "on the road."

Defendant also testified and explained, to the extent she was grabbing with her hands around the car, she "want[ed] to grab [her] phone," which was located in the center console, to record the officers, who she characterized as

approaching the vehicle rudely and aggressively. She testified she was unaware of the specific tools in the center console but stated her boyfriend owned many knives and was aware he used them in the scenario where they "were going somewhere and something happen[ed] to the car." She stated she also was grabbing with her hands in the backseat because her dog was in the backseat, and she was worried it would get hurt or escape. She also testified that the black 2009 Dodge Charger was registered to her. Defendant's testimony otherwise corroborated the officers' account of the interaction, including her decision to not heed the officers' orders, to "reach below," and "to grip into the steering wheel."

In her closing argument, defendant's counsel contended the MVR footage, in particular, established Officer McGavin immediately upon approaching the vehicle dispersed spray without any provocation. Counsel argued she was never told she was part of an investigation, and that she received "misdirection from the officers," where she was told to simultaneously place her hands on the steering wheel and exit it. Counsel contended, with respect to the pocketknife, "people carry knives," and her boyfriend kept a knife in the car to "repair cars . . . as a wire stripper," consistent with the other tools in the center console.

A-2169-23

Defendant's counsel also argued defendant was unaware of the pocketknife at the time of the interaction.

In response, the State contended defendant possessed the knives, including the pocketknife, which the officers "who approached that car . . . saw almost immediately." It argued her actions, including "refusing to exit the car after repeated commands," "locking her arms on the steering wheel," "pushing her body back into the seat," and "reaching for the center console" where two knives, including the pocketknife, were located, intentionally "create[d] chaos" to purposefully obstruct the investigation involving her boyfriend.

It emphasized these actions were not intended to help the friend, who, she believed, was overdosing, but rather her purpose was to specifically "protect her boyfriend" by obstructing. Finally, with respect to the pocketknife, the State argued she possessed it, and under the circumstances, it was likely to be used as a weapon.

The jury found defendant guilty of obstructing an investigation and unlawfully possessing the pocketknife but acquitted her of the remaining charges. Thereafter, defendant immediately moved to set aside the verdict. With respect to the obstruction conviction, she argued there was "[in]sufficient evidence presented to demonstrate[e] that [she] . . . was purposeful in her

intention." As to the unlawful possession conviction, she argued the pocketknife "ha[d] a useful purpose" that her boyfriend relied upon "for stripping wires, as he repair[ed] cars." In response, the State contended sufficient evidence supported the convictions in light of the testimony of the officers, defendant, and her boyfriend.

After considering the parties' oral arguments, the court orally denied defendant's motion in light of the "considerable testimony provided by the witnesses," in addition to the MVR footage from Officer McGavin and Officer Mezzanotte. The court also issued a written order and corresponding decision that denied defendant's motion pursuant to Rule 3:20-1.[2] In its written decision, the court relied on State v. Reyes, 50 N.J. 454 (1967) to support its conclusion that the jury "heard considerable evidence by the witnesses in this matter," and included both physical as well as testimonial proofs including testimony from officers, defendant, and her boyfriend, the playback of portions of that testimony, and footage of the MVRs from two of the officers. Defendant was sentenced, as noted, a Judgment of Conviction entered, and this appeal followed.

---

[2] Before us, the parties maintain defendant intended to move pursuant to Rule 3:18-2.

## II.

Rule 3:18-2 provides that "[i]f the jury returns a verdict of guilty . . . a motion for judgment of acquittal may be made, . . . [and] [t]he court on such motion may set aside a verdict of guilty and order the entry of a judgment of acquittal . . . ."  A court applies the same standard when deciding a motion for a judgment of acquittal under Rule 3:18-1 (a motion made before submission to a jury) or Rule 3:18-2.  State v. Papasavvas, 170 N.J. 462, 521 (2002).  The test is "whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt."  State v. Williams, 218 N.J. 576, 594 (2014).  "Under both Rules 3:18-1 and -2, the court 'is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the State.'"  Papasavvas, 170 N.J. at 521 (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)).

"An appellate court will apply the same standard as the trial court to decide if a judgment of acquittal was warranted."  State v. Felsen, 383 N.J. Super. 154, 159 (App. Div. 2006) (citing State v. Moffa, 42 N.J. 258, 263 (1964)).  To assess the sufficiency of evidence on an acquittal motion, an

14

appellate court applies a de novo standard of review.  <u>Williams</u>, 218 N.J. at 593-94.

III.

Defendant first contends the State failed to establish beyond a reasonable doubt that she acted with the purpose of obstruction, an element necessary to support the conviction.  She contends, at the time of the incident, which took place over the course of less than two minutes from the officers approaching to her arrest, she "was panicking, preoccupied with the chaos of the situation when she did not <u>immediately</u> comply with the officers' demands."  (Emphasis in original).  She asserts the context that her boyfriend was being arrested, that she believed the friend was overdosing, and that the officers did not clarify "what she was doing wrong," supports her contention that she did not purposefully act to obstruct.

Defendant argues the officers needlessly escalated the situation, their instructions contradicted themselves, and she was pepper-sprayed before she could react and "keep up with an increasingly volatile situation."  Defendant emphasizes that she could not have acted purposefully because she "did not understand what was happening to form the requisite purposeful mental state for obstruction."

15

N.J.S.A. 2C:29-1(a) provides as follows:

> A person commits an offense if he purposely obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from lawfully performing an official function by means of flight, intimidation, force, violence, or physical interference or obstacle, or by means of any independently unlawful act.

The offense is a fourth-degree crime "if the actor obstructs the detection or investigation of a crime." N.J.S.A. 2C:29-1(b). The obstruction or impairment "must be carried out in [the] manner [specifically] described in the statute." State v. Camillo, 382 N.J. Super. 113, 118 (App. Div. 2005). The statute does not require physical contact, but it does require obstruction by physical conduct. Id. at 121-22; see also State v. Berlow, 284 N.J. Super. 356, 360 (App. Div. 1995) ("[D]efendant must have affirmatively done something to physically interfere or place an obstacle to prevent the police from performing an official function.").

As relevant to the appeal before us, one of the elements to this charge is that a defendant must act purposely. N.J.S.A. 2C:29-1. While not defined in N.J.S.A. 2C:29-1(b) specifically, our Criminal Code defines "purposely" as follows:

> A person acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious

16

object to engage in conduct of that nature or to cause such a result. A person acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist.

[N.J.S.A. 2C:2-2(b)(1).]

We are satisfied the record is replete with overwhelming direct evidence that supports the jury's reasonable decision to find defendant guilty of obstruction, including that she acted purposely to this end. As confirmed by the officers' testimony and defendant herself, defendant repeatedly not only refused to comply with any of the officers' instructions, but instead decided to actively disobey them and reinforced her intent to continue to do so in vulgar and strong language. Although Officer Mezzanotte's MVR footage does not contain audio of what she specifically said to the officers, Officer McGavin's footage corroborates defendant's aggressive recalcitrance and failure to comply with any instructions. To the extent defendant claims her actions were actually motivated by her concern for the friend, we reject that contention in light of the officers' testimony, her own testimony, and the MVR footage.

Further, we reject defendant's argument that she could not have acted purposely in light of the alleged contradictory instructions she was given by the officers. To the extent that Officers McGavin and Mezzanotte's instructions

17

contradicted each other, we are convinced defendant's decision to actively ignore both instructions and continue to reach across the vehicle, as supported by the officers' testimony, confirms the jury was presented sufficient evidence that supported the conclusion that defendant's failure to comply with the officers' instructions was not on account of any confusion but rather accountable to her purposeful decision.

We also reject defendant's reliance on State v. Fede, 237 N.J. 138 (2019), and Camillo, 382 N.J. Super. at 118, for the proposition that her actions did not constitute sufficient physical conduct to support her conviction. In Fede, our Supreme Court concluded the defendant's failure to unchain his apartment door's lock did not constitute obstruction. 237 N.J. at 148. In Camillo, our court held the defendant's refusal to give an officer his contact information without any further physical conduct was not obstruction. 382 N.J. Super. at 118. Unlike the defendants' conduct in Fede and Camillo, defendant's actions here, as corroborated by the officers' and her testimony, support the conclusion that she took affirmative and physical steps to actively obstruct the officers, specifically locking herself into the steering wheel such that two officers struggled to remove her. Accordingly, we are convinced the record demonstrates defendant's physical conduct supports his obstruction conviction.

18

## IV.

Defendant next contends the State failed to present sufficient evidence that she possessed her "[boyfriend]'s pocketknife" under circumstances not manifestly appropriate for lawful use, the third element required to sustain a conviction under N.J.S.A. 2C:39-5(d). Defendant does not challenge the other elements required under such a conviction, namely that: (1) the folding pocketknife was a weapon, and (2) she possessed the weapon knowingly. See Telebright Corp. v. Dir., N.J. Div. of Tax'n, 424 N.J. Super. 384, 393 (App. Div. 2012) (deeming a contention waived when the party failed to include any arguments supporting the contention in its brief); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2026) ("[A]n issue not briefed is deemed waived.").

Specifically, defendant argues State v. Blaine, 221 N.J. Super. 66, 67 (App. Div. 1987) supports the position that her possession of the knife was appropriate given the circumstances because she did not "pose any reasonable threat," especially given the context that she was "simply driving a friend, who she believed was overdosing, to the hospital." She contends the "pocketknife" has a myriad of perfectly proper uses and was stored in the car's center console, a "perfectly ordinary place to store a knife." She further maintains the evidence

19

supports the conclusion that she was merely trying to look for her cellphone and was "under no obligation to prove a lawful purpose." In any event, she argues her alleged possession of the knife "lack[s] any of the sinister implications found in other cases where there was sufficient evidence to sustain a conviction."

N.J.S.A. 2C:39-5(d) provides, "any person who knowingly has in his possession any other weapon under circumstances not manifestly appropriate for such lawful uses as it may have is guilty of a crime of the fourth degree." The statute addresses "'the situation in which someone who has not yet formed an intent to use an object as a weapon possesses it under circumstances in which it is likely to be so used,'" namely "circumstances not manifestly appropriate for such lawful uses as those objects may have." Blaine, 221 N.J. Super. at 69-70 (quoting State v. Lee, 96 N.J. 156, 161 (1984)). The "'surrounding circumstances, such as the size, shape and condition of the knife, the nature of its concealment, the time, place and actions of the carrier when found in his possession'" can "indicate that possession of a knife may be 'not manifestly appropriate' for its lawful use." Lee, 96 N.J. at 162 (quoting State v. Green, 62 N.J. 547, 560 (1973)).

To sustain a conviction for N.J.S.A. 2C:39-5(d), the State must prove that the folding knife was possessed under such circumstances that a reasonable

person would recognize beyond a reasonable doubt that it was likely to be used as a weapon; in other words, under circumstances where it posed a likely threat of harm to others or a likely threat of damage to property. State ex rel. G.C., 179 N.J. 475, 483-84 (2004). Knives, however, are not inherently unlawful and can have legitimate uses. Lee, 96 N.J. at 162 ("a steak knife is appropriate at the dinner table, but sinister when concealed in a car with a BB gun."); State v. Brown, 325 N.J. Super. 447, 458 (App. Div. 1999) ("while a pocketknife belongs in one's pocket, a kitchen knife belongs at home[,]" and its presence in defendant's pocket during the commission of a crime satisfies N.J.S.A. 2C:39-5(d)). In this regard, "if the implement is a weapon, the question of whether defendant intends to use it lawfully or unlawfully is immaterial." State v. Riley, 306 N.J. Super. 141, 150 (App. Div. 1997); G.C., 179 N.J. at 482 ("Section 2C:39-5(d) does not require proof of such explicit intent.").

We are convinced defendant's repeated and continuous grabbing and reaching toward the specific area where the knife was located, which was open and visible to the responding officers, consistent with their testimony, during the commission of a separate crime, supports the jury's reasonable conclusion that her possession of the knife was not manifestly appropriate given the circumstances. See Brown, 325 N.J. Super. at 459 (upholding conviction where

A-2169-23

the defendant possessed a "kitchen knife with a five-inch long blade," during the commission of a robbery and assault); State v. Wright, 96 N.J. 170 (1984) (upholding conviction where the defendant possessed "an Exacto knife, with an eight-inch handle and a one-inch razor-like blade," during arrest for outstanding warrants); Lee, 96 N.J. at 160-61 (upholding conviction where the defendant possessed "scissors with blades taped together," during the commission of burglary); Riley, 306 N.J. Super. at 150 (overturning conviction where the defendant possessed a pocketknife during the commission of a robbery because trial court had found the pocketknife was not "intended to be used as a weapon"). Again, based on the officers' testimony, defendant repeatedly reached toward the center console, where both Officers Mezzanotte and McGavin observed the pocketknife, as she yelled and aggressively refused to comply with their instructions.

We reject defendant's argument that her conviction should be reversed because she testified that she was not reaching for the knife, but rather her phone or her dog, and that her boyfriend used the knife to repair the car. The jury was free to consider that competing testimony, but it, in of itself, does not compel we disregard the jury's verdict, particularly in light of the State's competing proofs, including the officers' direct testimony that she was reaching for the

22

knife while obstructing. To the extent that defendant contends her subjective intent mandates reversal, we disagree. State v. Montalvo, 229 N.J. 300, 317 (2017) (citing State v. Kelly, 118 N.J. 370, 380 (1990)) ("intent is not an element of unlawful possession of a weapon").

Further, we reject defendant's reliance on Blaine as factually distinguishable. In Blaine, our court held that the mere fact that defendant possessed a "four-inch folding knife," which officers discovered after his arrest pursuant to an outstanding warrant, was insufficient to support his conviction for unlawful possession. 221 N.J. Super. at 70. Unlike the arrest in Blaine where there was no indication the defendant ever reached for the knife or attempted to obstruct the officers during the arrest, the jury was here entirely within its province to conclude defendant's possession of the knife was unlawful based on the trial proofs that she repeatedly attempted to grab the knife while actively obstructing the officers' investigation. Accordingly, we are satisfied there is sufficient evidence to support her conviction for unlawful possession.

To the extent we have not specifically addressed any of defendant's arguments, it is because we have concluded they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

23

A-2169-23